IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


SHANNON CLOUD, ET AL            *

    V.                          *    CIVIL NO. WDQ-03-1300

G.C.A. INTERNATIONAL, INC.      *


## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs, Shannon Cloud, Debbra Bernard, and Johnetta Pippen, filed this action under Title VII of the Civil Rights Act of 1964 and under the Civil Rights Act of 1991, 42 U.S.C. § 1981(a), as amended, for injunctive relief, compensation for lost wages, and other injuries, losses, compensatory, pecuniary, and punitive damages caused by defendant's intentional acts of sexual discrimination and harassment.  After failing to respond to plaintiffs' complaint, pursuant to Rule 55 of the Federal Rules of Civil Procedure, Judge William Quarles entered a default judgment against the defendant, GCA International, and in favor of the plaintiffs on January 24, 2006.  Following the entry of default, in accordance with 28 U.S.C. § 636 and Local Rules 301 and 302, this case was referred to the undersigned to hold supplemental proceedings.

On March 28, 2006, pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure, an evidentiary hearing on damages was held.  Plaintiffs, Shannon Cloud, Debbra Bernard, and Johnetta Pippen, testified.  No documentary evidence or other testimony

was offered.  The defendant did not attend the hearing.

After considering the testimony introduced at the hearing, the demeanor of the witnesses and the plaintiffs' written submissions, the Court makes the following Findings of Fact and Conclusions of Law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

Each plaintiff's testimony of the individual sex harassment she suffered was highly credible.  Plaintiffs' descriptions of the sex harassment was not identical, but similar, corroborating each other.  The Court finds that the behavior of Mr. West, an employee of the defendant and the supervisor of the plaintiffs, reprehensible.  As their supervisor he subjected them to both verbal and physical sexual harassment, knowing that they were women who needed their jobs.  Of course, the liability of the defendant has already been determined by default.  The question remaining is the damages that the plaintiffs proved as a result of this harassment.  Under Title VII, plaintiffs may be entitled to back pay, front pay, compensatory and punitive damages.

**Shannon Cloud**

**Back Pay**

Plaintiff Shannon Cloud seeks back pay in the amount of $24,000.  Ms. Cloud began working for G.C.A. International ("GCA") in February of 2002.  Prior to working for GCA, the plaintiff worked in retail at a shoe store and was employed at

2

Andrews Air Force base.  The plaintiff testified that she was earning between $22,000 and $24,000 a year at the time she resigned from GCA, in June 2002.  The plaintiff remained unemployed until the middle of June 2003, when she began working for Today's Staff, a staffing agency, and eventually Vet Centric, a veterinary pharmacy.  Accordingly, the plaintiff was unemployed for about one year after her resignation from GCA.

The plaintiff testified that during her year of unemployment she filled out "hundreds" of applications, including applications for fast food restaurants and grocery stores, but was not able to find work.  However, the plaintiff did testify that during her year of unemployment, she went to school full-time and successfully completed a bachelor's degree in Microbiology from Bowie State University.  Although the plaintiff had been attending college on and off since graduating from high school in 1995, she testified that this was the first time she attended school on a full-time basis.

Although the plaintiff was out of work for approximately one year, equaling a loss of pay of about $24,000, the plaintiff chose to spend at least part of that year of unemployment in school, thereby failing to mitigate her lost pay damages.  "When an employee opts to attend school, curtailing present earning capacity in order to reap greater future earnings, a back pay award for the period while attending school would be like

receiving a double benefit." <u>Brady v. Thurston Motor Lines, Inc.</u>,
753 F.2d. 1269, 1276 (4th Cir. 1985).  While the Court believes
that plaintiff made some attempt to find employment, her full
time school attendance undoubtedly interfered with her job
hunting and given her prior, successful work history, the Court
questions the level of effort she made to find another job,
particularly when enrolled full-time in college.  Therefore, the
Court finds that the plaintiff is entitled to three (3) months
back pay or $6,000.

**<u>Compensatory Damages</u>**

Plaintiff Shannon Cloud also seeks compensatory damages for
emotional distress, embarrassment, humiliation, and stress
suffered as a result of her sexual discrimination.  The Court
finds the testimony of the plaintiff to be credible.  The
plaintiff testified that she was subjected to sexual harassment
on a daily basis during her term of employment with GCA.  She
further testified that Mr. West, her supervisor, told her
sexually explicit jokes, touched her in numerous ways, bit her
buttocks twice, and attempted to have sex with her on his desk.

As a result of this sexual harassment she does not want to
work with men and has only sought employment where the staff is
primarily women.  The plaintiff also testified that as a result
of the harassment, she no longer feels comfortable around men, is
nervous when men are around, and no longer wishes to be touched

4

by men, even for a handshake.  The only man with whom she feels comfortable is her father.

The plaintiff stated that the sexual harassment created emotional problems with her fiancee, specifically creating in her an inability to trust men.  As a result of these problems, the plaintiff postponed her wedding.

The plaintiff testified that she did not seek outside counseling to deal with the emotional problems that resulted from her sexual harassment, that she and her family are deeply religious, and that she only felt comfortable speaking with her female pastor about her problems.  She testified that she was not comfortable seeking someone outside her family or church to talk to about her problems.

The plaintiff was undoubtedly upset and humiliated by the sexual harassment she suffered while employed at GCA.  The sexual discrimination affected the plaintiff's ability to find work, and also affected her relationship with her fiancee.  The plaintiff testified that her emotional distress has not abated, and that she still feels uncomfortable today and does not like to be around groups of men.  The Court found plaintiff's testimony credible and her emotional response and suffering understandable. However, in the absence of evidence of psychiatric diagnoses and treatment or indeed any testimony from others, such as her pastor, and in light of Ms. Cloud's continued functioning,

including her continued studies and completion of her
undergraduate degree, the Court awards $10,000 for emotional
distress, embarrassment, humiliation, and stress suffered as a
result of the sexual discrimination, considering her period of
employment of six months and the nature of defendant's actions.

**Debbra Bernard**

**Back Pay**

Plaintiff Debbra Bernard seeks back pay in the amount of
$24,000.  The plaintiff began working for GCA in October of 2001.
The plaintiff testified that she was earning approximately
$24,000 a year at the time she was fired from GCA, on May 13,
2002.  The plaintiff testified that she remained unemployed for
slightly longer than one year, until she began work at the
Suburban Club in June 2003.  The plaintiff testified that after
her termination from GCA she was unable to do anything for a
while.  She also testified that she enjoyed her position at GCA
and therefore sought employment at another airline.  The
plaintiff said that she applied to airlines throughout the
Baltimore Washington Airport ("BWI"), but was not hired by any of
them.

Prior to working for GCA, the plaintiff was employed for two
years at Home Depot in customer service and as a cashier.  She
also testified that prior to working at GCA she worked for a

nursing agency as a certified nursing assistant.  The plaintiff
testified that she is not currently working because she recently
had a baby.  However, during the six months prior to having her
child, the plaintiff said that she was working as a certified
nursing assistant for Reliance, a staffing agency, earning $13.50
per hour.  Additionally, the plaintiff testified that during her
unemployment her only activity was looking for a job, but she
testified that she did not apply for nursing assistant positions,
only customer service jobs.

The plaintiff was out of work for approximately one year,
equaling a loss in pay in the amount of $24,000.  Nevertheless,
during that year of unemployment, the plaintiff chose to restrict
the type of employment she sought, thereby failing to fully
mitigate her damages.  A Title VII plaintiff has a statutory duty
to use reasonable diligence to find other suitable work.  42
U.S.C. § 2000e-5(g).  While this doesn't mean that a Title VII
plaintiff must go into another line of work, accept a demotion or
take demeaning work, this Circuit has held that after an extended
period of time searching for work, a plaintiff must consider
accepting suitable lower paying work to satisfy the duty to
mitigate damages.  Brady, 753 F.2d at 1275; Szedlock v. Tenet,
139 F.Supp.2d 725, 734 (E.D. Va. 2001).  According to the
plaintiff's testimony, she restricted her search for employment
to other customer service positions, despite being a certified

nursing assistant.  Therefore, the Court finds that the plaintiff is entitled to six months back pay or $12,000.

**Compensatory Damages**

Plaintiff Bernard also seeks compensatory damages for emotional distress, embarrassment, humiliation, and stress suffered as a result of her sexual discrimination.  The Court finds the testimony of the plaintiff to be credible.  The plaintiff testified that Mr. West, among other things, inappropriately touched her, cornered her in an elevator and tried to touch her breasts, asked her to touch his penis, and offered her a pay increase to have sex with him.  The plaintiff testified that as a result of the sexual harassment, she was physically and emotionally sick and she felt stressed.  The plaintiff testified that she spoke with family members about her emotional problems, as well as going to church.

The plaintiff also testified that she was seen at Sinai Hospital for physical problems she asserts are associated with stress from the sexual harassment.  In particular, the plaintiff testified that as a result of the sexual discrimination and termination, she had trouble with bleeding, was suffering from headaches, chest pain, stomach pains, and had trouble sleeping at night.  The plaintiff further testified that her doctor told her that her physical conditions were a result of her "worrying too much," and prescribed her muscle relaxers and other pills.

8

The plaintiff also stated that she is still stressed out because, as a result of her termination, she was unable to pay her bills, which resulted in her losing her car, apartment, and ruining her credit.  Because she was not able to find new employment, she was forced to move back in with her mother.

The plaintiff was undoubtedly upset by her termination.  The sexual discrimination affected the plaintiff both physically and emotionally, causing her stress which may have resulted in a number of physical ailments, such as an inability to sleep, headaches, and chest pains.  The plaintiff testified that she is still stressed as a result of losing her car, apartment, and living with bad credit.  Like Ms. Cloud, the Court found her testimony credible and her emotional response and suffering understandable.  However, in the absence of psychiatric diagnosis and treatment or other similar testimony and in light of her continued functioning, the Court awards $15,000 for these injuries she suffered as a result of the sexual discrimination, considering her approximately nine months of employment and the nature of defendant's actions.

**Johnetta Pippen**

**Back Pay**

Plaintiff Johnetta Pippen also seeks back pay in the amount of $24,000.  Pippen began working at GCA in February of 2002.  The plaintiff testified that she was earning $24,000 per year at

the time she was fired from GCA, on May 16, 2002.  At the time
the plaintiff was fired, she was also working part-time for Air
Canada.  The plaintiff testified that she worked at Air Canada
for approximately two months, working two hours a night at $10
per hour.  The plaintiff testified that after leaving Air Canada,
she was too stressed to look for other employment.  In August of
2002, she moved with her family to Texas, where she attempted to
work for FedEx.  She was employed part-time with FedEx for
approximately three weeks, earning $7 per hour.

The plaintiff testified that she did not feel comfortable
working for a long time after being fired from GCA.  Plaintiff
said that aside from her short-term position with FedEx she
remained unemployed for one year, until she began working for an
Army commissary on a part-time basis.  The plaintiff is now
currently employed as a bus driver in Texas, earning
approximately the same amount per year as she was earning while
employed at GCA.

The plaintiff's loss of pay for one year would be $24,000;
however, the plaintiff was employed at FedEx and therefore her
award must be reduced to reflect the amount earned during her
employment there.  Moreover, her testimony regarding her efforts
to find other employment was somewhat vague.  Accordingly, the
Court shall award six months of back pay minus her work at FedEx.
The plaintiff testified that she worked at FedEx fifteen hours

per week, at $7 per hour, for approximately three weeks.  The total income the plaintiff earned at FedEx is approximately $315 before taxes.  Accordingly, the plaintiff's lost pay will be adjusted to reflect the amount she earned during her period of unemployment.  Therefore, this Court awards the plaintiff $11,685 in back pay[1].

**Compensatory Damages**

Plaintiff Johnetta Pippen also seeks compensatory damages for emotional distress, embarrassment, humiliation, and stress suffered as a result of her sexual discrimination.  The Court finds the plaintiff's testimony to be credible.  The plaintiff testified that Mr. West, among other things, attempted to have sex with her, asked her if he could perform oral sex on her, touched her buttocks, breasts, and other parts of her body, and cornered her in an elevator and attempted to touch her breasts. The plaintiff testified that as a result of the sexual harassment she felt stressed and embarrassed.  The plaintiff testified that she has seen two Army psychologists to help deal with the

---

[1]Although the plaintiff moved to Texas in August of 2002, this does not reduce her back pay award. Because the plaintiff sought employment upon her arrival to Texas, as evidenced by her employment with FedEx, and therefore diligently mitigated her damages.  See Tidwell v. American Oil Company, 332 F.Supp. 424, 437 (C.D. UT 1971) (finding that plaintiff's back pay should not be reduced where the plaintiff moved with her husband to Arizona, but immediately began to look for work when she arrived); NLRB v. Robert Haws Co., 403 F.2d 979, 981 (6th Cir. 1968) (finding that plaintiff's right to back pay was not affected by his leaving the Detroit area to look for work in W. Virginia and Ohio).

emotional problems caused by the sexual harassment; however, no medical records or other documentary evidence of this care was presented.

The plaintiff testified that following the sexual harassment, she was too embarrassed to talk about what happened. The sexual harassment and the resulting emotional distress, caused problems between her and her husband.  The plaintiff testified that she is still stressed and embarrassed about what happened at GCA, and furthermore, that her relationship with her husband is only now getting better.  The plaintiff also stated that she was abused as a child, which she believes exacerbated the emotional problems resulting from the sexual harassment.

The plaintiff was undoubtedly upset and embarrassed after her termination from GCA.  The sexual harassment and termination, may well have caused her emotional problems, for which she has sought professional help.  The plaintiff testified that the sexual harassment has caused problems with her husband and family, and that those problems are only now getting better. Thus, the Court finds that the plaintiff is entitled to an award of $10,000 in compensatory damages for her injuries suffered as a result of the sexual discrimination, considering her period of employment of four months and the nature of defendant's actions.

**Punitive Damages for All Plaintiffs**

All three plaintiffs in this case seek punitive damages. 42

12

U.S.C. § 1981a authorizes punitive damages for Title VII plaintiffs if they can demonstrate that an employer engaged in an intentional discriminatory practice or practices "with malice or with reckless indifference to their federally protected rights." Bryant v. Aiken Regional Medical Centers, Inc., 333 F.3d 536, 548 (4th Cir. 2003) (quoting 42 U.S.C. § 1981a). The Supreme Court has held that the terms "malice" or "reckless indifference" "ultimately focus on the actor's state of mind." Thus, punitive damages are appropriate when a person discriminates "in the face of a perceived risk that [his] actions will violate federal law." Kolstad v. Am. Dental Ass'n, 527 U.S.526, 535-536 (1999). The Supreme Court further held that "while egregious misconduct is evidence of the requisite mental state, § 1981a does not limit plaintiffs to this form of evidence, and this section does not require a showing of egregious or outrageous discrimination independent of the employer's state of mind." Id. at 535; see also Lowery v. Circuit City Stores, Inc., 206 F.3d 431, 441-442 (4th Cir. 2000).

The inquiry does not end once the plaintiff has demonstrated the requisite mental state on the part of the actor. The plaintiff must also establish circumstances justifying the imputation of liability for punitive damages to the employer. Kolstad, 527 U.S. at 539. The Fourth Circuit has explained the punitive damages standard set forth in Kolstad as follows:

13

> When an employee has discriminated in the face of a
> known risk that his conduct will violate federal law,
> an employer may be held vicariously liable for a
> punitive damage award in a Title VII case for the
> intentionally discriminatory conduct of its employee,
> where the employee served the employer in a managerial
> capacity [and] committed the intentional discrimination
> at issue while acting in the scope of employment, and
> the employer did not engage in good-faith efforts to
> comply with Title VII.

Lowery, 206 F.3d at 442.

Even under the rigorous requirements of 42 U.S.C. § 1981a
and Kolstad, the plaintiffs in this case have presented
sufficient evidence to justify a grant of punitive damages.  The
plaintiffs have introduced sufficient evidence to show that Bobby
West, the manager of GAC's BWI office, engaged in egregious and
intentional sexual harassment and discrimination against the
plaintiffs.  Furthermore, the plaintiffs presented sufficient
evidence that Mr. West engaged in the discriminatory actions with
"malice" and "reckless indifference" to the federally protected
rights of the plaintiffs.  And, finally, the plaintiffs have
presented sufficient evidence that Mr. West's discriminatory
actions should be imputed to GAC, making GAC vicariously liable
for the punitive damages awarded in this case.

**Shannon Cloud**

As discussed above, in order to recover punitive damages
under Title VII, a plaintiff must show, 1) that the
discrimination occurred in the face of a perceived risk that it

14

would violate federal law, 2) that the discriminatory actor
served the employer in a managerial capacity, 3) that the
discrimination occurred in the scope of employment, and 4) that
the employer did not engage in good-faith efforts to comply with
Title VII.  Plaintiff Shannon Cloud has presented evidence
establishing each of these elements, and therefore is entitled to
punitive damages.

The plaintiff testified at trial that she was subjected to
sexual harassment on a daily basis during her employment at GCA.
The harassment began two weeks after she began working for GCA,
when Mr. West physically picked her up and said that she was the
"type of girl you could have sex with while standing up."  The
plaintiff testified that during the course of her employment she
was forced to listen to sexual jokes numerous times per day.  The
plaintiff said that when she was with Mr. West in his office, he
would suggest that the plaintiff sit on his desk and he would
describe the sexual acts he could perform on her while she was
doing so.  Mr. West also attempted to convince the plaintiff that
it would be a good idea for them to have sex.  The plaintiff
testified that she was forced to be in Mr. West's office at least
once a day, and that he would engage in the above described
behavior each time she was in his office.

The plaintiff testified that during the month of May, 2002,
Mr. West bit her twice on the buttocks while she was stacking

15

printed tickets on a desk near the shredder (Mr. West was sitting on the floor near the shredder while the plaintiff was stacking tickets).  When the plaintiff complained about the biting incident, she testified that Mr. West's response was that "her butt reminded me of a watermelon, so I bit it."  Mr. West also told the plaintiff that her breasts reminded him of cantaloupes. The plaintiff also testified that Mr. West would take her shoes off and play with her feet, grab her by the waist and pull her toward him, and that he would approach her as if he was going to whisper something in her ear and then lick her.

In Kolstad, the Supreme Court said, "under §1981a(b)(1), pointing to evidence of an employer's egregious behavior would provide one means of satisfying the plaintiff's burden to demonstrate that the employer acted with the requisite malice or reckless indifference." Kolstad, 527 U.S. at 539 (internal quotations omitted)[2].  In this case, the conduct of Mr. West is

_____

[2]Plaintiffs in Title VII cases have also been successful in meeting the "malice or reckless indifference" requirement by showing that the actor had knowledge of the law. See e.g., Lowery, 206 F.3d at 443. In these cases, plaintiffs have shown knowledge by demonstrating that the employer had a policy against sexual harassment, and that the actor had knowledge of the policy. EEOC v. Wal-Mart Stores, Inc., 187 F.3d 1241, 1246 (10th Cir. 1999) (finding manager discriminated in face of perceived risk where manager who approved employee's suspension was familiar with the accommodation requirements of the Americans With Disabilities Act and its prohibition against discrimination and retaliation in the workplace). In the present case, plaintiff Johnetta Pippen testified that GCA attempted to require her to sign a sexual harassment policy prior to picking up her last paycheck. While this could be considered evidence showing GCA acted with reckless indifference to the law, there is no evidence in the record to indicate that Mr. West had personal knowledge of the law or policy. Furthermore, in previous cases where a policy was sufficient to show knowledge of the law, the employer also provided the actor

so egregious and outrageous that it is sufficient to show the requisite mental state to support punitive damages.   The plaintiff testified that she was forced to put up with Mr. West's discriminatory behavior on a daily basis, and that she constantly asked him to stop to no avail.   The plaintiff also testified that she brought Mr. West's actions to the attention of her supervisor Suzette McClean, as well as to the attention of Meletha Colters but that his actions continued nevertheless.   The plaintiff also complained about Mr. West's behavior during a conference call with Mr. Tresky, the president of GCA.

The plaintiff also established that Mr. West served GCA in a managerial capacity.   In making the determination about managerial capacity, the court will look to the type of authority the employer has given the employee, the amount of discretion that the employee has in what is done and how it is accomplished. Kolstad, 527 U.S. at 543. To be in a managerial capacity, the employee must serve in a supervisory role, but need not be in the employer's top management, officers, or directors. Id.

Mr. West was the only manager for the BWI office, and as evidenced in the hearing, he was the only person in the office that reported directly to the President of GCA, William Tresky.

------

with training about the policy. See Lowery, 206 F.3d at 443-444 (finding actor had knowledge of the law where there was an anti-discriminatory policy and every person in management was required to attend a week-long training seminar that included education on the federal anti-discrimination laws).

The evidence presented suggests that Mr. West had the authority to hire and fire employees, manage the BWI office, and was responsible for its operation -- sufficient evidence of Mr. West's managerial capacity for purposes of vicarious liability in the punitive damages context.  Lowery, 206 F.3d at 447 (finding vicarious liability for punitive damages for the actions of a manager where the manager had the authority to make personnel decisions without guidelines or review); EEOC v. Wal-Mart Stores, Inc., 187 F.3d 1241, 1247 (10th Cir. 1999) (finding vicarious liability for punitive damages for the actions of a manager where the manager was responsible for the smooth operation of the store and making hiring and firing decisions).

The plaintiff established that Mr. West's discriminatory action took place within the scope of employment.  An employee is said to be acting within the scope of employment when the conduct is "the kind the employee is employed to perform, occurs substantially within the authorized time and space limits, and is actuated, at least in part, by a purpose to serve the employer." Kolstad, 527 U.S. at 543.  The evidence adduced through testimony is more than sufficient to meet this test.  All of the discrimination and harassment in this case occurred during working hours and at the company's office.  Mr. West was employed to perform as a manager, and the hiring and firing duties are, at least in part, for the purpose of serving GCA.

18

Finally, the plaintiff established that GCA did not engage in good-faith efforts to comply with Title VII. "The good-faith exception rests on the notion that the existence and enforcement of an anti-discrimination policy shows that the employer itself never acted in reckless disregard of federally protected rights." Lowery, 206 F.3d at 445. "While an employer's institution of a written policy against...discrimination...may go a long way...such a policy is not automatically a bar to the imposition of punitive damages." Id. at 446. There was evidence that GCA had a written sexual harassment policy; however, the only time that one of the plaintiffs was made aware of the policy was after she had been fired for reporting Mr. West's sexual harassment. This is not sufficient to justify applying the good-faith exception to GCA.

Because of the foregoing, the plaintiff Shannon Cloud is entitled to punitive damages in the amount of $25,000[3] -- an

---

[3] The financial status, or net worth, of a defendant is a proper factor to consider when determining the amount of punitive damages. Stamathis v. Flying J, Inc., 389 F.3d 429, 442 (4th Cir. 2004); Rest. 2d. Torts § 908. Although the plaintiffs in this case have failed to produce evidence of the defendant's net worth, punitive damages are still proper. Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 21-22 (1991) (finding that among the factors that *could* be taken into consideration when determining whether an award of punitive damages was excessive or inadequate is the financial status of the defendant). Finally, the Supreme Court said that where, as here, Congress has determined the penalties to be imposed, the courts should give substantial deference to that decision. BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 583-584 (1996). Since the punitive damages awarded here fall well within the statutory cap imposed by Congress and the proportionality guidelines of the Supreme Court, the awards are proper.

amount only $9,000 greater than the total award of back pay and compensatory damages.

**Debbra Bernard**

Plaintiff Bernard has likewise established that she is entitled to an award of punitive damages. Plaintiff Bernard testified that her sexual harassment first began when she was interviewed by Mr. West for a job at GCA. The plaintiff testified that a few months after she began working for GCA, Mr. West would use his finger to rub against her buttocks, as well as rubbing himself against her buttocks, as he passed between her and the ticket counter where she worked. She further testified that when she asked that he stop, he laughed and ignored her requests.

In April of 2002, Mr. West followed the plaintiff into an elevator, and once inside began rubbing himself in front of her and telling her that she had big breasts. The plaintiff asked him to stop, and when he wouldn't, asked to get out of the elevator. Mr. West would not let the plaintiff out of the elevator, and actually stopped the elevator to trap her inside. Once the elevator was stopped he attempted to touch the plaintiff's breasts and took his penis out of his pants and asked the plaintiff to touch it. The plaintiff complained to her supervisor, Suzette McClean, about the elevator incident, but testified that the sexual harassment did not stop after her

complaint.

The plaintiff testified that after the complaint about the elevator incident, Mr. West continued to touch her as he passed between her and the ticket counter.  Furthermore, she testified that he asked her to have sex with him, and even offered to give her a pay increase if she would do so.  The plaintiff was eventually fired from GCA on May 13, 2002.  The plaintiff testified that prior to her termination she never received a performance evaluation.  She further testified that, at her termination meeting, Mr. West indicated that the reason for her termination was that she was not doing her job and for "not keeping her mouth shut."

The plaintiff has established through her testimony that the conduct of Mr. West was sufficiently egregious to show that he was discriminating in the face of a perceived risk that it would violate federal law.  Furthermore, as stated above, the plaintiffs have established that Mr. West was serving in a managerial capacity, that the discrimination occurred during the scope of employment, and that GCA is not entitled to a good-faith exception from punitive damages.

Because of the foregoing, the plaintiff Debbra Bernard is entitled to punitive damages in the amount of $25,000 -- less than the total award of $27,000 for back pay and compensatory damages, and thus within the statutory cap and the Supreme Court

guidelines on proportionality.

**Johnetta Pippen**

Plaintiff Johnetta Pippen also established that she is
entitled to punitive damages under 42 U.S.C. § 1981a.  The
plaintiff testified that two weeks after she began working for
GCA, Mr. West told her that he would like to sit her on top of
his desk and perform oral sex on her.  According to the
plaintiff's testimony, Mr. West made this same comment to her on
a number of occasions.  The plaintiff also testified that Mr.
West would touch her on her buttocks and on other parts of her
body.  She also testified that Mr. West called her into the
elevator and began grabbing her breasts and other private parts.
She further testified that she would try to avoid going into Mr.
West's office to avoid his comments and touching.  The plaintiff
also testified that Mr. West told her if she ever told on him she
would be fired.

The plaintiff testified that she complained about Mr. West's
conduct to her supervisor, Suzette McClean, approximately two
weeks prior to being fired on May 16, 2002.  When Mr. West did
not cease his harassment of the plaintiff, the plaintiff called
GCA's main office in Arizona to lodge a complaint.  Two days
after the plaintiff called GCA's main office, Suzette McClean
terminated her.  The plaintiff testified that during the phone
call in which she was terminated, Suzette McClean indicated that

Mr. Tresky and Mr. West wanted the plaintiff terminated pending a sexual harassment investigation.

When the plaintiff returned to GCA to pick up her final paycheck, she was told she could not have her paycheck until she signed a copy of the sexual harassment policy.  When the plaintiff took her check and refused to sign the sexual harassment policy, GCA put a stop payment on her paycheck.

The plaintiff has established through her testimony that the conduct of Mr. West, and in the case of this plaintiff, Mr. Tresky, was sufficiently egregious to show that they acted in the face of a perceived risk that their actions violated federal law. Furthermore, as stated above, the plaintiffs have established that Mr. West was serving in a managerial capacity, that the discrimination occurred during the scope of employment, and that GCA is not entitled to a good-faith exception from punitive damages.

Because of the foregoing, the plaintiff Johnetta Pippin is entitled to punitive damages in the amount of $25,000 -- again an award under the statutory cap and consistent with the Supreme Court guidelines on proportionality, given the $21,685 award for back pay and compensatory damages.

Accordingly, the Court hereby awards the following to the plaintiffs: Shannon Cloud shall receive $6,000 in back pay, and $10,000 in compensatory damages.  Debbra Bernard shall receive

$12,000 in back pay and $15,000 in compensatory damages.

Johnetta Pippen shall receive $11,685 in back pay and $10,000 in

compensatory damages.   Plaintiffs Shannon Cloud, Debbra Bernard

and Johnetta Pippen shall each receive $25,000 in punitive

damages.

It is so ORDERED this ____31st____ day of July, 2006.


_____/s/_____
Susan K. Gauvey
United States Magistrate Judge